J-S16009-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: S.Y., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1931 MDA 2018 |

Appeal from the Decree Entered October 24, 2018
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2018-0097a,
CP-67-DP-0000311-2016

| IN THE INTEREST OF: S.Y., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1938 MDA 2018 |

Appeal from the Order Entered October 25, 2018
In the Court of Common Pleas of York County
Juvenile Division at No(s):  CP-67-DP-0000311-2016

BEFORE:  OTT, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                    **FILED: MAY 3, 2019**

A.R. ("Mother") appeals from the order entered October 24, 2018, which

changed the permanent placement goal of her daughter, S.Y. ("Child"), born

in June 2012, from reunification to adoption.  In addition, Mother appeals from

the decree entered that same day, which terminated her parental rights to Child involuntarily.[1]  After careful review, we affirm.

The record reveals that the York County Office of Children, Youth and Families ("CYF") filed an application for emergency protective custody of Child on December 5, 2016.  CYF averred that it first became involved with Child after receiving a referral on November 8, 2016.  Application for Emergency Protective Custody, 12/5/16, at ¶ 1.  The referral raised concerns that Mother was engaging in substance abuse and suffered from mental health issues, and that Child was experiencing physical abuse.  *Id.*  Mother submitted to a drug screen, which produced a positive result for attention deficit hyperactivity disorder medication for which she did not have a prescription.  *Id.* at ¶ 2. Mother denied any substance abuse and suggested that N.H., her boyfriend's mother, may have "'drugged her.'"  *Id.* at ¶ 3.  CYF later discovered that eight pills of prescription medication belonging to another member of Mother's household were missing.  *Id.* at ¶ 4.

CYF averred that it received an additional referral regarding Child on December 3, 2016.  *Id.* at ¶ 5.  The referral indicated that N.H. overheard Mother in the bathroom with Child, telling her to "'take it, it will help you sleep.'"  *Id.* at ¶ 7.  When N.H. entered the bathroom, she observed Mother and Child with a "white powdery substance on the vanity in the bathroom." *Id.* at ¶ 9.  Child stated that her "'belly hurt'" and that Mother "had given her

_____

[1] Child's father, J.Y., is deceased.

a white powder that 'tasted bad.'" *Id.* at ¶ 10. N.H. took Child to the emergency room, where she tested positive for opiates. *Id.* at ¶ 11. Later that day, police officers confronted Mother about Child's positive drug screen, at which time Mother appeared to be under the influence of substances. *Id.* at ¶ 16. Mother's pupils were dilated and her eyes were "'bouncing all around.'" *Id.* The police arrested Mother and charged her with recklessly endangering another person, endangering the welfare of a child ("EWOC"), and possession with intent to deliver ("PWID"). *Id.* at ¶ 19. In the interim, CYF obtained a verbal order placing Child in protective custody. *Id.* at ¶ 23-24. The juvenile court entered an order for emergency protective custody on December 5, 2016[2], followed by a shelter care order on December 7, 2016. CYF filed a dependency petition that same day, including averments identical to those in the application for emergency protective custody. The court adjudicated Child dependent on December 20, 2016.

Mother posted bail and was released from incarceration on January 19, 2017. N.T., 9/25/18, at 37. Mother's bail conditions required her to have no contact with Child[3] and to reside with a family member. *Id.* at 92-93, 96. However, Mother's closest family member was her paternal aunt, who resided

---

[2] Reportedly, Mother had been planning a one-way trip to Texas, and CYF had concerns that she would take Child and then "flee the area." Application for Emergency Protective Custody, 12/5/16, at ¶ 12-14.

[3] Mother twice requested that the criminal court change her bail conditions so that she could have contact with Child, but the court denied her requests. N.T., 9/25/18, at 93-95.

in Wabash, Indiana. *Id.* at 66, 96, 113. Mother remained in Wabash until January 2018, when she returned to Pennsylvania for the jury trial on her criminal charges. *Id.* at 66, 69. Child testified against Mother during her trial, which was the first time Child had seen Mother since December 2016. *Id.* at 69. The jury found Mother guilty of PWID, EWOC, and recklessly endangering another person, and she received a sentence of ten to 20 months' incarceration.[4] *Id.* at 37. Mother's sentence prohibited her from having any contact with Child "unless [CYF] deemed it appropriate."[5] *Id.* at 39, 41. Mother remained incarcerated until August 12, 2018, during which time she had no further contact with Child. *Id.* at 37, 69-70. After her release, Mother moved to Texas to live with her father.[6] *Id.* at 38-39. The parole authorities

_____

[4] Mother's conviction is currently on appeal to this Court, and was argued March 5, 2019.

[5] The record is inconsistent as to whether Mother requested visits with Child after her criminal trial in January 2018. The CYF caseworker first testified that Mother requested visits sometime after February 2018, but that she did not follow up that request by filing a petition. N.T., 9/25/18, at 68-69. Later, the caseworker agreed that Mother did not request visits after her trial. *Id.* at 106-07. The caseworker explained that Mother did not request visits with Child while serving her sentence, and that CYF did not believe visits at the jail would have been appropriate anyway. *Id.* at 109. In addition, CYF did not believe that visits would have been appropriate after Mother's release from incarceration, "as a result of filing for termination[.]" *Id.* at 102.

[6] CYF learned through the Interstate Compact on the Placement of Children that both Mother's paternal aunt and father have prior histories of involvement with child protective services in their respective states. N.T., 9/25/18, at 97. The trial court indicates in its opinion that Mother moved to Texas to live with her father because her parole conditions required her to live with a relative.

J-S16009-19

in Texas report that Mother obtained employment,[7] passed a drug screen on September 20, 2018, and completed parenting classes while incarcerated in Pennsylvania. *Id.* at 40. In addition, Mother received referrals for mental health and drug and alcohol evaluations.[8] *Id.* She will remain under supervision until August 1, 2019. *Id.* at 41.

CYF filed petitions to change Child's permanent placement goal from reunification to adoption and terminate Mother's parental rights involuntarily on July 31, 2018. The court held a hearing on the petitions on September 25, 2018,[9] after which it entered an order changing Child's goal and a decree terminating Mother's rights on October 24, 2018. Mother timely filed notices

_____

Trial Court Opinion, 10/24/18, at 13. Our review of the certified record does not support the existence of this requirement.

[7] The record indicates only that Mother has engaged in part-time employment while not incarcerated. N.T., 9/25/18, at 67.

[8] Mother's parole conditions include complying with a mental health and drug and alcohol evaluation, and parenting classes. N.T., 9/25/18, at 39. Mother completed a prior mental health and drug and alcohol evaluation at the Bowen Center in Indiana, but did not comply with the evaluation's recommendation that she attend therapy. *Id.* at 66-67, 84, 92, 99

[9] Child had one attorney during the proceedings, who acted as both her legal counsel and guardian *ad litem*, and argued in support of changing Child's goal and terminating Mother's parental rights. As explained in greater detail below, no conflict existed between Child's best interests and legal interests. Child's preferred outcome in this case is that she remain in her foster home and that Mother either live with her in the foster home or visit her there. N.T., 9/25/18, at 23-32.

- 5 -

of appeal, along with concise statements of errors complained of on appeal on

November 21, 2018.[10]

Mother now raises the following claims for our review:

I. Whether the trial court erred in terminating the parental rights of [Mother] pursuant to Sections 2511(a)(1), (2),[](5) and (8) of the Adoption Act?

II. Whether the trial court erred in concluding that termination of parental rights would best serve the needs and welfare of the child pursuant to Section 2511(b) of the Adoption Act?

III. Whether the trial court erred in concluding [Mother] failed to meet many of the goals and terminating her parental rights as she was preclude[d] from doing so in large part due to incarceration and bail conditions that prohibited her from having any contact with the minor child and when she was permitted contact [CYF] refused to permit contact between Mother and the minor child?

IV. Whether the trial court erred in changing the goal from reunification to adoption?

_____

[10] It appears that Mother's counsel produced a single notice of appeal, including the docket numbers from both the goal change and termination cases, which was then photocopied and filed separately on both dockets. This Court issued a rule to show cause order on December 14, 2018, out of concern that counsel may have failed to comply with our Rules of Appellate Procedure by filing only a single notice of appeal. **See** Pa.R.A.P. 341, Note ("Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."); **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) (holding that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal"). Counsel replied on December 24, 2018, averring that he filed two separate but identical notices of appeal. Thus, counsel asserted that he had complied with Rule 341 and **Walker**. In light of counsel's averments, and this Court's recent decision in **In the Matter of: M.P.**, 2019 WL 850581 at *2 (Pa. Super. filed Feb. 22, 2019) (declining to quash due to the appellant's noncompliance with Rule 341 but announcing that this Court would quash any noncompliant appeals filed after February 22, 2019), we decline to quash Mother's appeal.

Mother's brief at 5-6 (unnecessary capitalization, trial court answers, and suggested answers omitted).

We begin by reviewing the order changing Child's permanent placement goal from reunification to adoption. We review the trial court's order pursuant to an abuse of discretion standard of review. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). As such, we must accept the trial court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law. *Id.*

The Juvenile Act governs proceedings to change a child's permanent placement goal. *See* 42 Pa.C.S.A. §§ 6301-6375. Trial courts must apply the following analysis:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

In its opinion, the trial court found that Mother has made only minimal progress toward achieving reunification with Child since the adjudication of dependency. Trial Court Opinion, 10/24/18, at 7. The court found that Mother has had no contact with Child. *Id.* at 8. While Mother completed a mental health and drug and alcohol evaluation in Indiana while on bail prior to her criminal trial, which recommended she obtain therapy, Mother did not report any therapeutic involvement. *Id.* at 9-10. The court further found that Mother has failed to obtain stable and appropriate housing. *Id.* at 10-11. The court observed that Mother's paternal aunt, and her father, with whom she resided during the termination hearing, both have histories of involvement with child protective services in their respective states. *Id.* Finally, the court explained that Mother has taken no responsibility for her circumstances and that Child reports that she would not feel safe alone with Mother. *Id.* at 11.

Mother challenges the trial court's findings, arguing that she attempted to comply with her Family Service Plan ("FSP") goals, but that her efforts at reunification "were often prevented by obstacles outside of her control." Mother's brief at 32-33. Specifically, Mother maintains that compliance with her FSP goals would have required her to have contact with Child. *Id.* at 33. Mother emphasizes that she requested modification of her bail conditions so that she could have contact with Child, but to no avail. *Id.* Mother further contends that she attended parenting classes and the "Thinking for a Change" program while incarcerated, participated in counseling, obtained employment, and maintained sobriety. *Id.* at 34.

Our review of the record supports the trial court's conclusion that a goal change to adoption would be in Child's best interest. At the time of the hearing in September 2018, Child had been in foster care for nearly two years. Child was four and a half at the time she entered foster care and, by the time of the hearing, was approaching six and a half. Meanwhile, Mother was no closer to achieving reunification. As detailed above, a jury convicted Mother of criminal charges in January of 2018. Mother remained incarcerated until August 12, 2018, after which she moved to Texas to reside with her father. Mother's residence in Texas is not appropriate for Child, because Mother's father also has a prior history of involvement with child protective services in that state. Moreover, Mother has failed to demonstrate that she can maintain the stability and sobriety necessary to care for Child. It is clear that Mother will not be in a position to provide Child with a safe and permanent home at any point in the foreseeable future.[11]

In addition, the record reveals that Child does not share a parental bond with Mother and instead shares a bond with her pre-adoptive foster parents. The trial court conducted an interview of Child *in camera*, during which Child referred to her foster parents as her "mom and dad." *Id.* at 19. Child agreed

---

[11] While Mother argues that she was unable to comply with her FSP goals because of the no-contact order preventing her from visiting with Child, the record does not support this claim. The CYF Caseworker testified that Mother's most important FSP goals were to cooperate with CYF, obtain stable housing, and lead a drug-free life. N.T., 9/25/18, at 63-64. Mother did not require contact with Child in order to comply with these goals.

that Mother was her biological mother and referred to her as the person "I got born with." *Id.* at 22. However, she stated that she would not feel safe being alone with Mother, and that she would prefer to continue living in her foster parents' "safe house." *Id.* at 23-24, 32. Child explained, "I just really miss [Mother] and I want her -- like I don't want to move -- like move back to her house." *Id.* at 23. Child proposed that Mother should also come live with her foster parents and stated that she would "be sad" if Mother were not able to move into her foster home. *Id.* at 23-24. Nonetheless, Child confirmed that she would still want to continue living with her foster parents and would "just want [Mother] to visit me there."[12] *Id.* at 25, 29, 32. Therefore, we discern no abuse of discretion by the court in changing Child's permanent placement goal from reunification to adoption.

We next turn our attention to the decree terminating Mother's parental rights to Child involuntarily. We review the trial court's decree in accordance with the following standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

---

[12] Significantly, Mother conceded during her testimony that, since Child "hasn't seen or spoken to me in so long, she hardly knows who I am." N.T., 9/25/18, at 127.

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Mother's parental rights to Child pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision pursuant to Sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

- 11 -

\*\*\*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by considering whether the trial court abused its discretion by

terminating Mother's parental rights pursuant to Section 2511(a)(2):

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation

omitted). "The grounds for termination due to parental incapacity that cannot

- 12 -

be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Child came into placement because of the criminal charges filed against Mother. Even though Mother has appealed her conviction, the court found that Mother continues to lack stable housing and full-time employment, and that she has chosen to live with either her paternal aunt in Indiana or father in Texas, both of whom have prior histories of involvement with child protective services, and pose a threat of harm to Child. Trial Court Opinion, 10/24/18, at 16-17.

Mother, however, maintains that CYF produced insufficient evidence to terminate her parental rights involuntarily. Mother's brief at 15. She focuses her argument on Section 2511(a)(1), and makes little if any effort to challenge the trial court's findings as to Sections 2511(a)(2), (5), and (8). She asserts that her incarceration impaired her ability to obtain housing and employment, but that she tried to perform her parental duties by participating in programs while incarcerated. *Id.* at 15-16, 22-23, 30. Mother also blames her failure to achieve reunification on the no-contact provisions of her bail and criminal sentence. *Id.* at 16-21, 28-30. She emphasizes that she made two attempts to have her bail conditions changed so that she could have contact with Child, but that her efforts were unsuccessful. *Id.* at 16-19.

The record supports the trial court's finding that Mother is incapable of parenting Child, and that she cannot or will not remedy her parental incapacity pursuant to Section 2511(a)(2). As discussed above, Mother is in no position to parent Child safely, and will not be able to correct that situation at any point in the foreseeable future. Mother continues to lack appropriate housing for Child, and she has failed to demonstrate that she can maintain stability and sobriety. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

We next assess whether the trial court committed an abuse of discretion by terminating Mother's parental rights to Child involuntarily pursuant to Section 2511(b). The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and

should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

The trial court found that Child does not have a parental bond with Mother. Trial Court Opinion, 10/24/18, at 17. Instead, the court found that Child has a parental bond with her foster family and that Child looks to the foster family for safety and comfort and that she wants to continue living in her foster home, where she can achieve the stability she deserves. *Id.* at 16, 18. Therefore, the court concluded that terminating Mother's parental rights would best serve the needs and welfare of Child. *Id.* at 18.

In response, Mother maintains that she has a bond with Child and that Child misses her and wants to continue seeing her. Mother's brief at 25-27. She also maintains that the trial court acted improperly by terminating her parental rights based solely on her financial limitations and inability to obtain housing. *Id.* at 25-26; *see* 23 Pa.C.S.A. § 2511(b) ("The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.").

We discern no abuse of discretion by the trial court in concluding that termination of Mother's parental rights would best serve Child's needs and welfare. As we explained in our analysis of the court's goal change order, the record indicates that Child shares a strong parental bond with her pre-adoptive foster parents. While Child states that she misses Mother, she wants to continue living in her foster home. Child stated that she would not feel safe being alone with Mother, and that she would either want Mother to live with her at the foster home, or visit her there. Accordingly, the record confirms that Child does not share a parental bond with Mother, and that terminating Mother's parental would not cause Child to suffer irreparable harm.[13]

Based on the foregoing, we conclude that the trial court did not abuse its discretion or commit an error of law by changing Child's goal to adoption or by terminating Mother's parental rights involuntarily. Therefore, we affirm the court's order and decree.

Order affirmed. Decree affirmed.

---

[13] We reject Mother's assertion that it was improper for the trial court to terminate her parental rights based on environmental factors beyond her control. Section 2511(b) provides that a court may not terminate parental rights "solely on the basis" of environmental factors. 23 Pa.C.S.A. § 2511(b). It is clear that the court did not terminate Mother's parental rights solely on this basis.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/3/2019